NOTICE
Decision filed 02/07/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220686-U

NO. 5-22-0686

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| LUCAS C. WEBB, | ) | Johnson County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 20-D-33 |
| | ) | |
| KYLA E. WEBB, | ) | Honorable |
| | ) | Cord Z. Wittig, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's denial of the petitioner's petition to modify the allocation of significant parental decision-making authority and parenting time with regard to the parties' youngest child was not against the manifest weight of the evidence.

¶ 2    The petitioner, Lucas W., appeals the October 7, 2022, order of the circuit court of Johnson County denying, in part, his petition to modify the court's November 17, 2020, allocation of parental responsibilities and parenting time regarding the parties' minor child, Vera W. For the following reasons, we affirm.[1]

_____

[1]We note that the respondent has failed to file an appellee's brief. There are three distinct, discretionary options a reviewing court may exercise in the absence of an appellee's brief: (1) it may serve as an advocate for the appellee and decide the case when the court determines justice so requires, (2) it may decide the merits of the case if the record is simple and the issues can be easily decided without the aid of the appellee's brief, or (3) it may reverse the trial court when the appellant's brief demonstrates *prima facie*

1

¶ 3                                    I. BACKGROUND

¶ 4    The petitioner and the respondent, Kyla W., were married on October 14, 2006, and had three children, Vada W., born May 1, 2007; Deacon W., born January 16, 2010; and Vera W., born August 21, 2016. On November 17, 2020, the trial court entered a judgment of dissolution of marriage, which incorporated the parties' agreed judgment of allocation of parental responsibilities and parenting time. According to the agreed judgment, the parties were allocated joint significant decision-making authority, and the respondent was designated the parent with the majority of the parenting time. However, since the petitioner was awarded and remained in the marital residence in Johnson County, the petitioner's residence was designated the primary residence of the minor children for school registration purposes.

¶ 5    On September 3, 2021, the petitioner filed a petition to modify parental responsibilities, alleging that there had been a substantial change in circumstances in that Vada and Deacon resided with him full-time due to verbal and/or physical abuse they suffered from the respondent's boyfriend, Bryce Gibson. The petitioner indicated an order of protection was entered against Gibson after an incident where Gibson allegedly called Deacon derogatory names and also grabbed Deacon by the arm and threw him on the bed, causing bruising on his arm. Thus, the petitioner requested that the respondent's parenting time be restricted and that the minor children reside with him full-time. That same day, the petitioner filed an emergency petition to modify, requesting that the minor children be allowed to fully reside with him until the matter was resolved.

¶ 6    Before the August 2022 hearing on the petition to modify, the trial court conducted an *in camera* interview of Vada and Deacon outside the presence of the parties. Subsequently, at the

reversible error that is supported by the record. *Thomas v. Koe*, 395 Ill. App. 3d 570, 577 (2009). In this case, the record is simple, and the claimed errors are such that we can easily decide them without the aid of the appellee's brief.

hearing, the following testimony was presented by the parties. Rhonda Carlton, Deacon's sixth grade homeroom teacher at Ewing Northern Grade School, testified that, since Deacon began attending school there in late September 2021 or early October 2021, his grades had improved, and the petitioner assisted with that. She also noticed that his interactions with the other students had improved. He was initially nervous being at a new school, but he eventually became a class leader and was very well behaved and respected by his peers. She had no conversations with the respondent about Deacon. However, she acknowledged that she did not witness anything unusual in Deacon's behavior and that it was not uncommon for new students to be nervous and have initial issues adjusting to a new school.

¶ 7    Jeri Miller, the principal at the Goreville school, testified that, in the fall of 2021, Deacon approached her and told her that the respondent was coming to pick him up from school, and he did not want to go with her. He then asked Miller to call the petitioner, which she did. He did not leave with the respondent that day, and shortly thereafter, he stopped attending school there.

¶ 8    The petitioner testified that he has lived in Whittington, Illinois, for 1 to 1½ years, and he was to married Chelsea W. His wife, Vada, and Deacon lived with him, and Vera spent considerable time there. Vada was 15 years old and was a sophomore at Benton High School. She had been living with him full-time since March 2021 after she made allegations of abuse against the respondent. The petitioner explained that the Illinois Department of Children and Family Services (DCFS) became involved in the matter, and he was told that it would be in Vada's best interests to live with him. Since then, the respondent had not contacted him about having parenting time with Vada or inquired about her wellbeing. Vada felt some resentment toward the respondent and had sent some inappropriate text messages to the respondent after learning that the respondent

3

was having a baby with Gibson. However, the petitioner punished her and explained that her language in the messages was inappropriate.

¶ 9     Deacon was 12 years old and was in seventh grade at Ewing grade school. Deacon came to live with the petitioner in the fall of 2021 after an incident that occurred at the respondent's house. The petitioner explained that, that day, Deacon was very upset and had bruising on his arm that looked like a handprint, so they reported it to the police department. Subsequently, Deacon moved in with him. Although DCFS was involved, the petitioner did not inquire as to whether they made any findings of abuse or neglect related to the incident. He acknowledged that the photograph taken of the bruising on Deacon's arm did not show a handprint. However, he explained that the photograph was in black and white, so it was not visible. After the incident, the respondent did not contact him about Deacon until January 2022. The petitioner noted that Deacon received Ds and Fs at his previous school, but after Deacon was enrolled in his new school, the petitioner worked with him and the school to improve his grades.

¶ 10     Vera was five years old, and the petitioner exercised his parenting time with her; the parties had equal parenting time. She was very close to Vada and Deacon, and she saw them when she was at the petitioner's house. The petitioner noticed that Vera became very anxious and occasionally acted out when it was time to return to the respondent's house; she only exhibited this behavior when it was time for her to return to the respondent's house. Vera attended kindergarten in Goreville. She had trouble with reading, but once the petitioner became aware of this, he had discussions with her teacher, and they ultimately obtained assistance for her. The respondent never told him that Vera was struggling with reading.

¶ 11     Although the petitioner's residence was designated as the children's primary residence for school purposes, he did not change Vera's school when he moved to Whittington because it was

4

the middle of the school year. However, since he believed that, under the parenting plan, Vera's school was based on his address, he registered her for school in Ewing for fall of 2022. He texted the respondent about changing Vera's school but acknowledged that he did not have the respondent's consent before registering Vera in the Ewing school district. He also acknowledged that, at the time the parenting plan was entered into, he lived in Johnson County and then subsequently moved to Whittington in March 2021. Vera was enrolled in the Goreville school district in August 2021, he did not object to her attending school there at that time, and she attended school in Goreville for the entirety of the 2021-22 school year.

¶ 12    The petitioner testified that he was concerned about Vera remaining in the respondent's home because of Gibson. Vada and Deacon were also concerned, and they were very protective of Vera. He noted that, when Vera discussed Gibson, she became upset. Consequently, he requested that the trial court modify the parenting plan so that she primarily resided with him.

¶ 13    The petitioner was employed as a nurse practitioner at Herrin Hospital and worked Monday, Tuesday, and every other weekend. However, his schedule was flexible and could be altered if necessary. His wife was employed at Benton Hospital, Vera had a very good relationship with her, and they got along very well. His children had a relationship with his extended family who lived close by; one of his sisters and his mother lived in McLeansboro. They were available to transport Vera from school if he was working.

¶ 14    The petitioner testified that, on multiple occasions, he attempted to have discussions with the respondent about his concerns regarding Gibson. However, she was unwilling to talk to him about it. He also tried to have conversations with her about the children's school and other things, but she would not respond to his text messages. He never made negative comments about the respondent to the children.

¶ 15    The respondent testified that she lived in Goreville and was employed by the Illinois Youth Center (IYC) Harrisburg. Gibson was her boyfriend, and he did not live with her, but they were having a child together. He occasionally stayed the night at her house while Vera was present. He had a house in Carterville, and, if they decided to live together, they would live there. However, they had not yet made that decision. He was employed as the warden of programs at the IYC Harrisburg. He did not have a criminal history and was not violent toward her.

¶ 16    After an incident in the spring of 2021, the respondent agreed to allow Vada to stay with the petitioner to give them some space; she explained that Vada was being very defiant. Although she believed that Vada would return, Vada never did. The respondent consented to Vada continuing to reside with the petitioner because she believed that forcing Vada to return would result in further harm. Since Vada moved, the respondent had no significant amount of time with Vada; they had exchanged text messages and had seen each other during parenting time exchanges. On one occasion, she saw Vada at a community event, but Vada refused to make eye contact or speak to her.

¶ 17    The respondent testified that, in August 2021, there was an alleged incident between Deacon and Gibson where Deacon reported that Gibson grabbed him by the arm and shoved him on a bed. Deacon claimed that he had entered the respondent's bedroom while she was having sex with Gibson, and then he left the room. Gibson followed him into his bedroom, which is where the incident occurred. However, the respondent denied that the incident happened and noted that there was no interaction between the two of them that night. She noted that the only time that Gibson left her bedroom that night was when he left the house, and she had walked him to the door. She also noted that there was no interaction between Gibson and Vada that night as Vada was not there. She explained that she was in the bathroom getting ready for bed when Deacon entered her

6

bedroom. He was being defiant about going to bed, so she told him to go to bed. He then left the room and went into his bedroom. At the time, Vera was asleep in her bed, and Gibson was in the bedroom. She learned of the allegations against Gibson when a police officer attempted to serve him with an order of protection at her house.

¶ 18    The respondent's mother told her that the day before the alleged incident with Gibson, Deacon was involved in a fight at school. The respondent did not see the bruising on Deacon's arm, and she did not ask him anything about the incident with Gibson. She was aware that there were allegations that Gibson had called Deacon derogatory names, but she had never heard Gibson say anything derogatory to Deacon. Deacon currently lived with the petitioner, and she consented to him continuing to live there. She had only minimal contact with the petitioner about having parenting time with Deacon because they did not communicate well.

¶ 19    The respondent believed that, if she had parenting time with Vada and Deacon, it would be hard on them. She explained that she began having difficulty with them when she started dating Gibson. They made negative comments about Gibson and called him derogatory names. She described an incident in January 2021 where Deacon and Vada were being defiant and disrespectful, and Deacon called Gibson racial slurs. She explained that this was the first time that the children had met Gibson, and he did not provoke Deacon. She saw text messages from the petitioner to the children saying that Gibson was not a good person and should not be around them. The petitioner also used a racial slur in the messages and made derogatory comments and insinuations about his race. The respondent believed that counseling would be beneficial for her and the children to help establish healthy dynamics and mend their relationship. Thus, she requested that the court order counseling. Vera had a very good and positive relationship with

7

Gibson, and they watched cartoons together. His children and Vera were developing a sibling-like relationship.

¶ 20 Although Vera would be separated from her siblings during the respondent's parenting time, the respondent requested that she remain the parent designated the majority of the parenting time. The petitioner did not tell her about enrolling Vera in the Ewing school until after it was already done, and she objected at the time. When Vera was not at school, and the respondent was at work, she stayed with the respondent's mother. Vera had friends at the Goreville school. The respondent explained that, at the time of the parties' divorce, the petitioner's residence was designated as the children's primary residence for school registration purposes because she was moving out of the marital home and did not know where she would ultimately live. Also, at the time, the children were already attending school in Goreville. The petitioner never told her about his intention to move to Whittington, and she found out from the children.

¶ 21 The respondent acknowledged that the petitioner had previously messaged her about having contact with Vera during her parenting time, and she did not respond to him. She also acknowledged that Deacon was struggling in school when he was in the Goreville school district.

¶ 22 Bonita W., the petitioner's mother, testified that, in the spring of 2021, Vada was visibly upset and said that the respondent had kicked her out of the house and never wanted to see her again. Bonita called the petitioner, and Vada resided with him from that point forward. She observed the siblings' interactions with each other and believed that they had a good relationship and cared for one another. She noted that Vera loved her brother and sister and was excited to be around them. She also observed Vada and Deacon since they began living with the petitioner and noted that they were doing very well, they had joined clubs and were participating in

8

extracurricular activities, and they were very happy. She recently retired, so she was available if the petitioner needed any help with the children.

¶ 23    Chelsea W., the petitioner's wife, testified that she had a really good relationship with Vada, and Vada confided in her. Since Deacon started residing with her and the petitioner, she noticed changes in his behavior and his grades; his grades had improved, he had a much more positive attitude, and he had made several friends. Vada and Deacon were always excited to see Vera and spent all day with her doing family activities. They were always sad to see her leave. They had a loving relationship. Vera had friends in Whittington that she interacted with regularly, and she participated in gymnastics while there. Vera was a very outgoing child and had no problems making friends.

¶ 24    Chelsea testified that the petitioner never made negative comments about Gibson or the respondent in front of the children nor had he supported the children making negative comments about Gibson. Anytime Vada and Deacon voiced concerns about the situation, the petitioner always tried to calm them down and redirect the conversation. When they discovered that Vada had sent inappropriate text messages to the respondent, the petitioner reprimanded her immediately; he was very angry about the situation. They also had an extensive discussion about not saying certain things, even when angry.

¶ 25    Cindel Polhemus, the petitioner's sister, testified that she was close to Vada and that, when Vada primarily resided with the respondent, Vada called her when upset. She noticed a change in Vada's behavior since Vada moved in with the petitioner. Polhemus noted that Vada was happy, she socialized, and she engaged in activities.

¶ 26    Penny Brookins, Chelsea W.'s mother, testified that she lived close to her daughter, and she had been around the children and observed their interactions with her daughter. Brookins noted

9

that Cheslea had a fabulous relationship with the children, she loved them very much, and she helped provide for them and took care of them. She noted that the petitioner was a wonderful father, and he also took care of the children's daily needs. She also noted that the three children interacted with each other and loved playing games at family game night.

¶ 27   Mary Lynn Erkmann, the respondent's mother, testified that she watched Vera while the respondent was at work. Erkmann noted that Vera adored the respondent, and she always ran to the respondent when the respondent arrived home from work or when she came home from parenting time with the petitioner. The respondent and Vera had a very close relationship; they talked to each other, shared things with each other, watched movies and cartoons together, and baked together. Erkmann also had a good relationship with Vera; they played games together, did activities together, and played with dolls. The respondent was pregnant, and Vera was excited about the baby. Erkmann did not know how long it had been since she had seen Vada and Deacon, but she recently contacted the petitioner about seeing them, and he did not respond. Prior to August 2021, she saw Vada and Deacon on a regular basis. However, after the parties divorced, and the respondent began dating, she noticed a change in their behavior. Erkmann observed that Vada was verbally and physically aggressive toward the respondent and sometimes her siblings. She also observed that Deacon exhibited frustration, had a temper, and would yell.

¶ 28   Erkmann indicated that, the morning of the hearing, she drove to Whittington to pick Vera up from the petitioner's house and took her to school before the hearing, even though the petitioner was driving that same direction. She was told that the petitioner was not bringing Vera with him.

¶ 29   Erkmann observed Gibson's interactions with Vera; Erkmann noted that they were very friendly, Vera adored him and hugged him, and she asked about his children when she saw him.

10

Gibson had two children, a one-year-old and a four-year-old. Vera was always happy to see them, and they played well together.

¶ 30    After hearing the testimony, including the *in camera* interviews of Vada and Deacon, the trial court found that Deacon's allegations of abuse against Gibson were proven by a preponderance of the evidence. The court then acknowledged that, if abuse was established as to one child, there was a presumption of abuse regarding the other children pursuant to the Juvenile Court Act. However, the court noted that the evidence presented revealed that, for Vera, the respondent's home was a good environment; it was a "kind loving environment" with fun and games. The court found that the respondent's home was a perfectly fine, normal, and acceptable environment for Vera and that both homes provided a loving, stable environment for her. The court noted that the environment might have been different for Vera because the older children were more in tune with what was going on and maybe they had assigned blame. Thus, the court determined that it would essentially maintain the status quo by granting the petition to modify as it related to Vada and Deacon but denying it as it related to Vera. In making this decision, the court acknowledged that it was splitting the children up but noted that it had been working out over the past few months. The court also acknowledged the parties had difficulty communicating with each other and asked the parties' attorneys to present additional argument as to the allocation of significant parental decision-making authority. After hearing both attorneys argue for joint decision-making authority, the court granted joint decision-making authority, noting that with the issues between the parties mostly resolved that day, some of the tension might be relieved. The court also admonished the parties that they must communicate for the sake of the children. Therefore, the court allocated sole decision-making authority of Vada and Deacon to the petitioner,

allocated the parties joint decision-making authority over Vera, and determined that the original parenting time schedule would remain in effect for Vera.

¶ 31    The trial court also ordered that Vera remain in the Goreville school district. In deciding, the court noted that, when the parenting plan was created, the petitioner resided in the marital residence in the Goreville school district, and it was anticipated that Vera would attend school there.

¶ 32    On October 7, 2022, the trial court entered a written order, reiterating its oral findings. The petitioner appeals.

¶ 33                                            II. ANALYSIS

¶ 34    The petitioner contends that the trial court's allocations of significant parental decision-making authority and parenting time regarding Vera were against the manifest weight of the evidence. Specifically, he argues that the evidence demonstrated that there was physical abuse in the respondent's home, the respondent refused to communicate with him about the children, their other children lived with him, and he had a stable home with ample family support in the area.

¶ 35    Section 610.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) sets forth the requirements for modification of orders allocating parental decision-making responsibilities and parenting time. 750 ILCS 5/610.5(c) (West 2020). Specifically, section 610.5(c) provides that

> "the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." *Id.*

12

¶ 36    Accordingly, the court may modify parenting time or the allocation of parental responsibilities if a substantial change has occurred since the existing allocation judgment was entered, and a modification is necessary to serve the children's best interests.

¶ 37    Once a substantial change in circumstances has been found, the trial court must determine whether modification is necessary to serve the children's best interests. *Id.* To determine the children's best interests for the modification of the allocation of significant parental decision-making authority, the trial court must consider all relevant best-interest factors, including: (1) the children's wishes; (2) the children's adjustment to home, school, and community; (3) the mental and physical health of all individuals involved; (4) the parents' ability to cooperate to make decisions; (5) the level of each parent's participation in past significant decision-making about the children; (6) any prior agreement or course of conduct between the parents regarding decision-making; (7) the parents' wishes; (8) the children's needs; (9) the distance between the parents' residences; (10) whether a restriction on decision-making is appropriate; (11) the willingness and ability of each parent to facilitate and encourage a relationship between the minor children and the other parent; (12) the physical violence or threat of physical violence directed against the children; (13) the occurrence of abuse against the children or other member of the children's household; (14) whether one parent is a sex offender or resides with a sex offender; and (15) any other factor that the court expressly finds to be relevant. *Id.* § 602.5(c).

¶ 38    Moreover, in determining the children's best interests for modifying parenting time, the trial court considers the following best-interest factors set forth in section 602.7(b) of the Act: (1) the parents' wishes; (2) the children's wishes; (3) the amount of time each parent spent performing caretaking functions with respect to the children in the 24 months preceding the filing of the petition; (4) any prior agreement or course of conduct between the parents; (5) the

13

interaction and interrelationship of the children with their parents and siblings or any other significant person; (6) the children's adjustment to home, school, and community; (7) the mental and physical health of all involved; (8) the children's needs; (9) the distance between the parents' residences, the cost of transporting, the families' daily schedules, and the ability of the parents to cooperate; (10) whether a restriction on parenting time is appropriate; (11) physical violence or threat of physical violence; (12) the willingness and ability of each parent to place the needs of the children ahead of his or her own needs; (13) the willingness of each parent to facilitate and encourage a close and continuing relationship between the other parent and the children; (14) the occurrence of abuse against the children or other members of the household; (15) whether one of the parents is a convicted sex offender; (16) the terms of a parent's military family-care plan; and (17) any other factor that the court expressly finds to be relevant. *Id.* § 602.7(b); *In re Marriage of Adams*, 2017 IL App (3d) 170472, ¶ 20.

¶ 39 The trial court's decision regarding whether to modify the allocation of parental decision-making authority and parenting time is subject to a manifest weight of the evidence standard of review. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004). This decision is afforded great deference because the trial court is in a superior position to judge the credibility of the witnesses and determine the children's best interests. *Id.* at 516. A judgment is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *In re Custody of K.P.L.*, 304 Ill. App. 3d 481, 488 (1999).

¶ 40 Here, although the petitioner was allocated sole decision-making authority and parenting time with regard to Vada and Deacon, the parties were allocated joint decision-making authority over Vera, and the respondent remained the parent with the majority of the parenting time with

14

her. The court also determined that Vera would continue to attend school in Goreville. In making this decision, the court accepted Deacon's allegations of abuse against Gibson and noted that, once abuse allegations were established by a preponderance of the evidence, there was a presumption of abuse regarding the other children under the Juvenile Court Act. However, the court found that presumption was rebutted by the evidence demonstrating that the respondent's home was a kind, loving environment for Vera and a perfectly acceptable, stable home for her. The court acknowledged that this decision split up the children but noted that this arrangement had been working out.

¶ 41    Upon careful review of the record, we find that the trial court's decision was not against the manifest weight of the evidence. The court observed the witnesses and heard the testimony, including *in camera* testimony from both Vada and Deacon, about the alleged physical and mental abuse that occurred in the respondent's home and about the respondent's lack of communication with the petitioner about the children. However, the court still found that the respondent's home was a good environment for Vera and presumably found that the parties would be able to effectively communicate in the future for joint parental decision-making authority over Vera. Although the court recognized the parties' past difficulty with communicating, the court felt that the resolution of the present issues would help relieve any tension between the parties. It was also noted by the parties' attorneys that the petition to modify was the first filing between the parties regarding issues that they were unable to resolve, and they had not had any trouble resolving any medical issues that had arisen regarding the children. Moreover, we note that there was no evidence presented that showed that Vera was a victim of any of the alleged abuse that occurred in the respondent's home, but there was testimony presented about how Vera was very friendly with Gibson and about how she adored him and his children and was affectionate toward him.

15

¶ 42    As a reviewing court, we may not reweigh the evidence, assess witness credibility, or set aside the trial court's decision simply because a different conclusion could have been drawn from the evidence. See *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 51 ("It is well settled that a reviewing court's function is not to reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence."). The petitioner's arguments are essentially asking this court to reweigh the evidence and reassess witness credibility, which we will not do. There is no indication from the record that the trial court failed to consider the relevant statutory best-interest factors, or the evidence presented on those factors, in reaching its decisions on parental decision-making authority and parenting time. Thus, we conclude that the trial court's rulings on decision-making responsibilities and parenting time were not against the manifest weight of the evidence.

¶ 43    Further, we find that the court's decision that Vera remain in the Goreville school district was supported by the evidence where the initial parenting plan was entered when the petitioner resided in the marital residence, which was located in the Goreville school district, and the respondent was unsure about where she would ultimately live after the dissolution. Also, when the parties entered into the initial agreement, it was anticipated that Vera would attend school in Goreville, and she had been attending school there since kindergarten. Accordingly, we affirm the trial court's allocations of parental decision-making authority and parenting time.

¶ 44                                    III. CONCLUSION

¶ 45    For the foregoing reasons, the judgment of the circuit court of Johnson County is hereby affirmed.


¶ 46    Affirmed.

16